CLARENCE W. PRETTYMAN, *et al.*

*v.*

HOPKINS MOTOR COMPANY

(No. 10614)

Submitted February 2, 1954. Decided April 2, 1954.

712

*James P. Clowes, Joseph R. Curl, Handlan, Garden, Matthews* and *Hess,* for plaintiff in error.

*Schmidt, Hugus* and *Laas, Henry S. Schrader,* for defendant in error.

HAYMOND, JUDGE:

This action of assumpsit was instituted in the Circuit Court of Ohio County on October 8, 1951, by the plaintiffs Clarence W. Prettyman and Helen Marie Prettyman, doing business as Prettyman Trucking Service, to recover from the defendant Hopkins Motor Company, a corporation, damages in the amount of $2000.00 alleged to have been sustained by the plaintiffs by reason of the failure of the defendant to return, without damage or injury, a certain 1947 Model Dodge four door sedan automobile owned by the plaintiffs which had previously been delivered to the defendant to be repaired and painted by the defendant for compensation to be paid to it for performing that service.

The case was called for trial October 20, 1952. The demurrer of the defendant to the declaration was overruled and the defendant filed a special plea and a plea of non assumpsit. To those pleas the plaintiffs filed their general replication. The special plea alleged, as a defense to the claim of the plaintiffs, that after the delivery of the automobile to the defendant the automobile and the place of business of the defendant were destroyed by a fire which occurred through no fault of the defendant and that, because of the fire, the defendant did not deliver the automobile to the plaintiffs upon their demand for such delivery. A jury was impaneled and selected to determine the issues presented by the foregoing pleadings.

By written stipulation of attorneys representing the respective parties it was admitted, in lieu of evidence to that effect, that the defendant, on and prior to October 20, 1949, the day of the fire, was a West Virginia corporation; that it occupied and possessed, as tenant of the owner, a building at No. 37 Twentieth Street in Wheeling, West Virginia, in which it operated a garage business for the purpose of dealing in, repairing, and servicing automobiles for compensation; that the equipment and the facilities of the building, the garage, and the business conducted by it, were under its exclusive management and control; that two or three days before October 20, 1949, the plaintiffs, the owners, delivered to the defendant a 1947 Dodge four door sedan automobile to be repaired and painted by the defendant; and that the value of the automobile on October 20, 1949, was $1417.50.

When the plaintiffs introduced evidence that they were the owners of the automobile, that it had been delivered to the defendant at its place of business for repairs to its fender, grill and light and to be painted by the defendant, and that the automobile was not returned to the plaintiffs for the reason that it was destroyed and rendered worthless by a fire which occurred in the building on October 20, 1949, and had also produced the foregoing stipulation, they concluded their proof. The defendant then moved the court to direct a verdict for the defendant. The court sustained the motion but, before directing the jury to return a verdict in favor of the defendant, permitted the plaintiffs to reopen the case and to offer evidence to establish negligence of the defendant with respect to the origin and the cause of the fire. The plaintiffs, under protest, offered evidence for that purpose and, at the conclusion of all the evidence introduced by them, the defendant again moved the court to direct a verdict in its favor. The court overruled the motion and the defendant introduced evidence to show that the fire was not caused by any fault or negligence of the defendant. At the conclusion of all the evidence the defendant renewed its motion for a directed verdict. The court overruled the motion, gave certain

instructions, and submitted the case to the jury. After some consideration of the case by the jury it was unable to agree upon a verdict and, before it had finally concluded its deliberations, the court directed it to return a verdict for the defendant. The jury returned a verdict as directed. The court overruled a motion by the plaintiffs to set aside the verdict and grant a new trial and, by order entered February 10, 1953, rendered judgment in favor of the defendant and awarded costs against the plaintiffs. To that judgment this Court granted this writ of error upon the petition of the plaintiffs.

The building occupied by the defendant as a tenant, and in which its garage and the automobile of the plaintiffs were located at the time of the fire which occurred in the morning of October 20, 1949, was a four story structure situated at No. 37 Twentieth Street in the City of Wheeling, the external walls of which were of brick construction and the interior of which was of wooden construction. The first or lower story, which extended below the level of the street, was known as the subbasement of the building. The height of the subbasement between its cement floor and the ceiling was approximately eight feet. This ceiling consisted of wooden joists on top of which was located the wooden floor of the second story. This floor contained in places grease and oil which had been deposited from automobiles serviced on that floor or story of the building. An inside stairway led from the subbasement to the second story. In the northwest corner of the subbasement was a furnace room approximately ten feet wide and thirty feet long the two interior walls or partitions of which were of wooden construction and extended from the floor to the ceiling. Entrance to this furnace room from inside the subbasement was provided by a wooden door in one of the partitions and at the north end of the furnace room there was a second wooden door in the outside wall of the building which was used for the removal of ashes from the furnace room. In this section were located the furnace of the heating system of the building and a coal storage bin. The northeast section of the subbasement contained a

paint booth and a wash rack and the remaining portion was used for storage.

The furnace was approximately five feet wide, seven feet long and five feet high. In the front wall of the furnace was a small door which was used in its operation. Coal of the prepared size of about one inch in thickness was supplied as fuel for the furnace by an automatic, electrically controlled stoker, in the operation of which coal from the hopper of the stoker was transmitted to the fire box at the bottom of the furnace by means of a revolving metal shaft or worm. The fire box contained holes through which air was supplied to the coal by means of a fan with which the stoker was equipped. The process of firing the furnace consisted primarily in maintaining a fire in the fire box which ignited the coal as it was carried to the bottom of the fire box by the stoker when in operation, but in starting a fire in the furnace the coal at the top of the fire box was first ignited. The normal overall operation generally resembled the maintenance of a fire by means of a bellows.

When the plaintiffs, to avoid a directed verdict for the defendant, were required to offer proof to show that the fire which destroyed their automobile was caused by negligence of the defendant, they called as witnesses in their behalf an employee of the defendant who had acted as janitor of the building and had operated the stoker during a period of two and one half years preceding the fire, a consulting industrial fuel engineer of more than twenty six years' experience, two experienced municipal smoke prevention inspectors, a local fire inspector, and the chief of the local fire department. These witnesses testified with respect to the cause and the nature of the fire and the general condition of the building at and prior to its origin.

The employee of the defendant who operated the stoker testified that he came to work about fifteen minutes before seven o'clock in the morning of October 20, 1949; that he first went to a room on one of the upper floors of the building where he left his lunch; that he then went to the furnace room in the subbasement, opened the door of the

furnace, and noticed "a few hot coals" in it; that he stirred them "a little bit", put a small amount of coal on the fire pot, and turned on the fan, which started the fire; that, after waiting for a few seconds and until the fire was started, he "threw about four scoop shovels on, and by that time the fire was burning good."; that the fire then "was a good fire"; that he "set the stoker up three notches"; and that he then went upstairs to do his work of cleaning the building. He further testified that there was a lead damper at the rear of the furnace which he did not adjust; that the damper was "half open" or "wide open"; that he did not clean the fire box that morning but had cleaned the furnace and the pipes a few days previously; that the fan and the stoker were working; that after he left the furnace room to clean the offices he returned about forty five minutes later at approximately eight o'clock; that when he came to the furnace he saw no reflection of light through the space between the furnace door and the front of the furnace which was noticeable "when the furnace would be burning"; that there was no such reflection that morning; that he had a large "wrecking bar"; that he opened the furnace door and that "there was no fire there and I stepped down and I was going to stick this big bar in there and stir the coal up, and I don't know whether I got the bar in or not but the blast hit me in the face—a puff of smoke and blast, and burned my hand and side of my face, and I jumped up out of there and I went out in the other part and hollered for another fellow, Fred Gersting. He said I was burned, and I looked into the mirror and I saw my face was burned and my hand and my sweater was burned, and I turned back around to the furnace room and I discovered the fire coming out through the crack next to the upper floor. I come back and got the fire extinguisher and it didn't seem to be doing much good and I set the fire extinguisher down and there was a big ice cream truck setting directly over the furnace. I was going to try to move that truck off of there. It was directly over the furnace, and the fire was coming up between the wall when I got there, and I went on up through and out the

front of the building and by that time the fire company was there." He further testified that on one or two previous occasions when "the flame would be low", there had been a "puff" which threw smoke and soot from the furnace but that he did not report those occurrences because "it was nothing to get excited about, a small puff of smoke."

This witness stated that he had been instructed in the operation of the furnace by a shop foreman who had told him how to regulate the water and the pressure and how to fire the furnace; that he had seen "furnaces fired" and knew "how to do it" before he went to work for the defendant; that he had been instructed to place coal on top of wood and paper in starting a fire, to turn on the fan, and then to put "a couple of more shovels on and let it get started good and that is all there was to it.", but that he had not been instructed how to maintain a fire, or how to regulate the air when starting a fire, or as to how much air should go into the furnace when starting a fire; and that there was a chart in the furnace room which contained instructions concerning the regulation of the gears in supplying the proper amount of coal, but that there was no chart which contained instructions as to the manner of firing the furnace. He also stated that when he put the second shovelful of coal in the furnace he scattered the coal; that he waited a few seconds and then put "about three or four more on" which he also scattered; and that there was a "good fire burning" in the furnace and the stoker was operating when he went upstairs to do his work as janitor. He further stated that the weight of each of the shovelfuls of coal which he placed on the fire was approximately fifteen or sixteen pounds.

One of the fire inspectors testified that he had made several inspections of the building occupied by the defendant prior to October 20, 1949, the last of which was approximately five months before the fire; that there were oil spots on the floor of the story immediately above the subbasement; that there were cracks or spaces between the outer walls of the building and the floor but that none of his inspections had disclosed any con-

ditions that were "bad from a fire standpoint"; and that he had never notified or required the occupant or the owner of the building to correct its condition. The other fire inspector, the chief of the muncipal fire department, testified that he had inspected the building three or four years before the fire; that when he inspected the building the floor immediately above the furnace room was saturated with oil or drippings from automobiles; that there were some cracks of the size of a half or three quarters of an inch between the walls and the edge of the floor immediately above the furnace room; that such fire hazards as gasoline in tanks, the drippings from automobiles, and the lacquers and the enamels in the paint shop, were present in the building at the time of his inspections, but that he had made no complaint to the defendant concerning the condition of the building; that he arrived at the scene of the fire within ten or fifteen minutes after its origin; and that at that time the rear and the lower floors of the building were "fairly well inflamed" and there was more fire on the floor immediately above the subbasement than there was in the subbasement.

The testimony of the industrial fuel engineer and the two smoke prevention inspectors was in large measure based upon hypothetical questions propounded to them which incorporated the facts testified to by the operator of the stoker with respect to the manner in which he operated it at and shortly before the origin of the fire. These witnesses expressed the opinion, based on those facts, that the conduct of the operator of the stoker was not reasonably proper or reasonably safe and that such conduct on his part caused the fire to the building; and they also testified that the proper method to start a fire in the furnace was to place a small amount of coal on the fire in the fire box from time to time and in that manner keep the fire "open" and prevent the accumulation of explosive gas which occurs when the top of the fire box is covered with coal.

The evidence offered by the defendant to show that the

fire to the building was not the result of fault or negligence on its part consisted of the testimony of the vice president of the company which manufactured stokers of the same type as the stoker used by the defendant, who was experienced in designing and operating stokers, a stoker mechanic of fifteen years' experience, a local municipal fire inspector, and an employee of the defendant who repaired and painted automobiles in the subbasement and who was present when or immediately after the fire occurred. The vice president and the stoker mechanic expressed the opinion, based upon the facts testified to by the operator of the stoker at the time of the fire, that his conduct in its operation was safe and proper, and each of them testified, in effect, that it was common practice and proper to put coal on top of burning coal in starting a fire in a furnace operated by a stoker in order "to build up" the fire. The fire inspector stated that he had made several inspections of the building prior to October 20, 1949, the last inspection having been made within one year before the fire, and that he had not found any condition in the building in connection with his inspections that "needed correction." The testimony of the employee of the defendant who painted automobiles in the paint shop in the subbasement, Fred Gersting, was that when he came to work a few minutes before eight o'clock in the morning of October 20, 1949, he saw the employee who operated the stoker come from the furnace room; that he heard no explosion; that the face of the operator of the stoker was burned and his sweater was burning; that the witness then saw flames at the top of the furnace room where the partition joined the ceiling; that he tried without success to extinguish the fire with a fire extinguisher; and that he then went upstairs and outside the building.

The principal errors assigned by the plaintiffs as grounds of reversal are the action of the circuit court (1) in requiring the plaintiffs to offer evidence to show that the destruction of the automobile was caused by the negligence of the defendant before the defendant offered evi-

dence in explanation of its failure to return the automobile to the plaintiffs; and (2) in withdrawing the case from the jury before it completed its deliberations upon the issue of negligence upon the part of the defendant, in directing a verdict in favor of the defendant, and in entering judgment upon the verdict.

The precise questions presented by the first of the foregoing assignments of error have not been determined in any reported decision of this Court. The transaction by which the plaintiffs placed their automobile in the exclusive possession and control of the defendant to be repaired and painted for compensation to be paid to it by them when the work of repairing and painting the automobile was performed was for the mutual benefit of the respective parties and constituted a bailment for hire. The benefit to the plaintiffs was the performance of that service and the benefit to the defendant was the payment of compensation when the automobile was repaired and painted. That the bailment was of that character is conceded by the attorneys for the plaintiffs and the attorneys for the defendant.

This Court has held with respect to a gratituous bailment for the benefit of the bailee that, when the property delivered to the bailee is lost or injured, the bailee, to relieve himself of liability, must show that the loss or injury occurred through no fault or negligence upon his part.

In *Myers* v. *Summerville*, 90 W. Va. 486, 111 S. E. 487, an employee of the defendant company became surety upon a peace bond for one year executed by the plaintiff, also an employee, who deposited with the surety two $50.00 liberty bonds, as indemnity, which were to be returned at the end of the year unless the peace bond was forfeited. The liberty bonds were deposited by the surety with other agents of the defendant and placed in its safe. In defense of the claim of the plaintiff for damages upon the failure of the defendant to return the bonds after the expiration of the year, the defendant showed that they

were lost while in its possession but offered no excuse for their loss. Upon a demurrer to the evidence the trial court entered judgment against the defendant for the value of the bonds. In affirming the judgment this Court held that if the transaction should be regarded as a gratituous bailment the bailee, after demand by the bailor for the return of the bonds, was required to show some excuse for their loss.

In *Windom* v. *Boundy,* 94 W. Va. 551, 119 S. E. 804, involving a gratituous bailment for the sole benefit of the bailee, the plaintiffs loaned a well drilling bit owned by them to the defendant to enable him to drill a well. The defendant agreed to return the bit within a week or ten days. While in the possession of the defendant the bit was damaged. The defendant caused certain repairs to be made and returned the bit to the plaintiffs who refused to accept it and, contending that in its damaged condition the bit was worthless, sued the defendant before a justice of the peace to recover its value. A judgment for the plaintiffs was reversed on appeal to the circuit court which, on the ground that the pleadings were fatally defective, directed a verdict and entered judgment for the defendant. It appears that the evidence in behalf of the plaintiffs was that the bit when loaned to the defendant had been thoroughly tested in drilling hard materials and was of good quality and adapted to such use and that the evidence in behalf of the defendant was that the bit broke while in use at a shallow depth but the evidence offered by the defendant did not detail the manner in which the bit was used at the time it broke. This Court reversed the judgment of the circuit court and held that "Where goods are loaned for the sole benefit of the borrower and are injured while in his possession, the burden of proving that such injury occurred through no fault or negligence of the borrower rests upon him; and where the evidence as to that fact is conflicting, the question is one for the jury." The statement in that case that "the burden of proving that such injury occurred through no fault or negligence of the borrower rests upon him" is held to

mean that the burden of going forward with the evidence to show that the injury occurred through no fault or negligence of the borrower shifted to him for the reason that the burden of proving negligence upon the part of the borrower, the bailee in that case, does not shift but continues to rest upon the plaintiff, the bailor, throughout the trial of the action.

In *Bank of Hundred* v. *County Court of Wetzel County*, 94 W. Va. 733, 120 S. E. 878, involving the deposit by a bank of securities with a county court and the failure of the county court to return the securities because they were stolen by unknown persons from the custody of the depositary with which they had been placed for safe-keeping, this Court expressed the view that the bailee was not relieved of liability for its failure to return the bonds by merely showing that the bonds had been stolen.

With respect to the questions of burden of proof, pre-sumptions, and the establishment of a prima facie case, in actions involving bailments, the decisions of the courts in the various jurisdictions are conflicting. "Where the issue of the bailee's negligence is raised in an action, the question of burden of proof on that issue is complicated not only by the common difficulty that 'burden of proof' is used in two senses, but also by the fact that a distinc-tion is recognized in some jurisdictions, applied in others, and apparently neither recognized nor applied in still others, between actions in which recovery is sought on the theory of breach of contract and those in which the bailee's negligence is made an essential element of the bailor's case." 6 Am. Jur., Revised, Bailments, Section 367.

The phrase "burden of proof" is sometimes given a double meaning. It means, in some instances, that a party to litigation must in the end establish a particular pro-position in order to succeed, and in other instances, that, at some stage in a trial, it is the duty of a party to go forward with the evidence. When used to express the idea that a party must establish a given proposition the burden

of proof does not shift at any time during the trial; but when used to express the idea that a party, at a certain stage of the trial, has the duty of going forward with the evidence it shifts with the evidence. *Hansen* v. *Oregon-Washington Railroad and Navigation Company,* 97 Or. 190, 188 P. 963, rehearing denied, 97 Or. 190, 191 P. 655; *Kohlsaat* v. *Parkersburg and Marietta Sand Company,* 4 Cir., 266 F. 283, 11 A. L. R. 686.

In cases in which the bailor has made negligence a factor and it appears that the property, while in the possession of the bailee, was stolen or destroyed by fire, the plaintiff is not relieved of the burden of proving negligence upon the whole case merely because there may be a presumption of negligence on the part of the defendant; but the bailor is not required to show that the loss of property was caused by the negligence of the bailee until after the bailee has introduced evidence to show that such loss was due to an excusable cause. 6 Am. Jur., Revised, Bailments, Section 368.

In 8 C. J. S., Bailments, Section 50 c (2) dealing with presumption of negligence and burden of proof in cases involving a bailment the text is in this language:

"In some of the older decisions it was held that the loss or injury raised no presumption of negligence on the theory that, the bailee not being considered an insurer of the goods, the law which never presumes any man negligent would rather attribute the loss to excusable causes, and that it was not enough for plaintiff to prove the loss or injury, but that he must go further and must show that the same had occurred by defendant's negligence. The rule adopted in other and the more modern decisions is that the proof of loss or injury establishes a sufficient prima facie case against the bailee to put him on his defense; and hence, where chattels are delivered to a bailee in good condition and are returned in a damaged state, or are lost or not returned at all, the law presumes the bailee's negligence or other fault to be the cause, and casts on the bailee the burden of showing that the loss

was due to other causes consistent with due care on his part, this rule being regarded as an application of the principle of res ipsa loquitur, and if the bailee does not sustain such burden the bailor becomes entitled as a matter of law to a verdict in his favor.

"The effect of this modern rule is not to shift the ultimate burden of proof from bailor to bailee, but merely to shift the burden of proceeding or going forward with the evidence; the ultimate burden of establishing negligence is on the bailor and remains on him throughout the trial." See also cases from many jurisdictions cited in note 87, 8 C. J. S., Bailments, Section 50 c (2), page 343.

The modern rule, stated in the foregoing quotation, is supported by the great weight of authority.

In commenting upon the rule the Supreme Court of Oregon in *Hansen* v. *Oregon-Washington Railroad and Navigation Company*, 97 Oregon 190, 188 P. 963, rehearing denied, 97 Or. 190, 191 P. 655, uses this language "* * * upon proof of delivery of chattels in good condition and proof of return in bad condition, or proof of failure to return, the law raises a presumption that the injury or failure to return was caused by the negligence of the bailee, and such proof plus the presumption, which because of necessity the law arbitrarily raises, make a *prima facie* case, which requires the bailee to go forward with evidence. This statement of the rule is, of course, made on the assumption that the bailor has done no more than to prove the naked fact of failure to return or the bare fact of injury, and that he has not attempted to account for the cause of the injury or nonreturn of the chattel. After the bailor has made a *prima facie* case, the bailee must assume the burden of going forward, and if he does take up the burden he may relieve himself of it and shift back to the bailor the duty or burden of going forward, by depriving the bailor's case of its *prima facie* quality and making a *prima facie* case for himself. If the bailee accounts for the injury or nondelivery of the chattel, by showing that it was stolen or that it was injured or

destroyed by fire or by some other cause which is consistent with the exercise of ordinary care on his part, and does not of itself point to negligence by him, then he has established for himself a prima facie case of due care, has deprived the bailor's case of its *prima facie* quality, and has made it necessary for the bailor again to go forward with the evidence and affirmatively show some causal negligence on the part of the bailee. *Colburn* v. *Washington State Art Assn.*, 80 Wash. 662 (141 Pac. 1153, L. R. A. 1915A, 594); *Knights* v. *Piella*, 111 Mich. 9 (69 N. W. 92, 66 Am. St. Rep. 375); *Claflin* v. *Meyer*, 75 N. Y. 260 (31 Am. Rep. 467); *Yazoo & M. V. R. Co.* v. *Hughes*, 94 Miss. 242 (47 South. 682, 22 L. R. A. (N. S.) 975); *Higman* v. *Comody*, 112 Ala. 257 (20 South. 480, 57 Am. St. Rep. 33); *Standard Marine Ins. Co.* v. *Traders' Compress Co.*, 46 Okl. 356 (148 Pac. 1019); *Holt Ice & Cold Storage Co.* v. *Arthur Jordan Co.*, 25 Ind. App. 314 (57 N. E. 575); *Schmidt* v. *Blood*, 9 Wend. (N. Y.) 268 (24 Am. Dec. 143, and note); *Darby Co.* v. *Hoffberger*, 111 Md. 84 (73 Atl. 565); *Lancaster Mills* v. *Merchants Cotton-Press Co.*, 89 Tenn. 1 (14 S. W. 317, 24 Am. St. Rep. 586)."

In *Kohlsaat* v. *Parkersburg and Marietta Sand Company*, 4 Cir., 266 F. 283, 11 A. L. R. 686, which involved the destruction of a derrick boat leased by Parkersburg and Marietta Sand Company, plaintiff below, to Kohlsaat and others, partners as C. Crane and Company, defendants below, the plaintiff recovered judgment for the loss of the boat caused by the negligence of the defendants. The District Court of the United States, Southern District of West Virginia, in the charge to the jury stated that the plaintiff had the duty to prove his case by a preponderance of the evidence; that the proof of the loss of the boat created a presumption that it was negligently lost; and that the burden of proof, upon the issue of negligence, was upon the defendants. The Circuit Court of Appeals of the United States, Fourth Circuit, reversed the judgment because of the error in charging the jury that the burden of proof was upon the defendants to show that the loss was not due to their negligence. In the opinion the

Court used this pertinent language: "A bailee for hire is not an insurer of the property placed in his possession, and cannot be held to answer if it be lost or damaged without his fault. He contracts to take ordinary care of the property, and is liable only for loss occasioned by his own negligence. Hence the essential element of a bailor's cause of action, the fact to be established by him, is negligence on the part of the bailee. On that issue the burden of proof rests all the while on the plaintiff, and at no stage of the trial can it be passed over to the defendant. True, it is often said that when the plaintiff proves delivery of the property to the defendant, and that it has not been returned as agreed, the burden of proof shifts to the other side. These facts may make a prima facie case, or, as the court below puts it, give rise to a presumption of negligence; but, whatever the form of expression, the meaning is always the same, namely, that it then becomes the defendant's duty to go forward with the evidence and explain how the damage occurred. And this is entirely reasonable, for presumably the facts in that regard are within his knowledge. But when this has been done, and especially if it be shown that the loss resulted from a cause consistent with due care on his part, the duty of going forward has been met and the prima facie case overcome; and for the reason that the right of recovery in such case depends upon whether or not the defendant was negligent, and on that issue, as already said, the burden throughout is on the plaintiff. And this has long been the settled rule of law."

In *O'Malley to Use of the National Union Fire Insurance Company of Pittsburgh* v. *Penn Athletic Club*, 119 Pa. Super. 584, 181 A. 370, in which the plaintiff recovered a judgment for damages for a coat delivered by the plaintiff to the defendant which was stolen while in the possession of the defendant, the court said:

"The rule of law, adopted in the modern jurisdictions, with respect to loss or injury to bailed articles is that 'the proof of loss or injury establishes a prima facie case against the bailee to put him upon his defense. Where

chattels are delivered to a bailee in good condition and * * * are lost or not returned at all, the law presumes negligence to be the cause, and casts upon the bailee the burden of showing that the loss is due to other causes consistent with due care on his part.' 6 Corpus Juris, 1158, Sec. 160, and citing in support thereof, inter alia, *The Safe Deposit Co. of Pgh.* v. *Pollack,* 85 Pa. 391; *Logan* v. *Mathews,* 6 Pa. 417; *Clark* v. *Spence,* 10 Watts, 335; *Hofford* v. *Central & Hudson River R. R. Co.,* 43 Pa. Superior Ct. 303; *Hoyt* v. *Clinton Hotel Co.,* 35 Pa. Superior Ct. 297; *Koch* v. *National Express,* 1 Lack. Leg. 289.

"In 6 Corpus Juris (supra) the rule is thus stated: '* * * if the possession of the bailee has not been exclusive of that of the bailor the rule does not apply. In order to throw the burden of evidence upon the bailee it is sufficient that the bailor has shown damage to the bailed article that ordinarily does not happen when the requisite degree of care is exercised. * * * The burden of proof of showing negligence is on the bailor and remains on him throughout the trial. The presumption arising from the injury to the goods or failure to redeliver is sufficient to satisfy this burden and make out a prima facie case against the bailee.' "

In *Agricultural Insurance Company* v. *Constantine,* 144 Ohio St. 275, 58 N. E. 2d 658, in which the plaintiff sought a recovery for damage to an automobile of its insured which he delivered to the defendant and which while in the parking lot of the defendant was stolen by a third person and later delivered to its owner in a damaged condition, the court held: "* * * that in an action brought by a bailor against a bailee for hire, a *prima facie* case is established where the bailor proves delivery of the bailed property in good condition and the failure of the bailee to redeliver upon legal demand. Upon proof of such state of facts the burden of proceeding with the evidence shifts to the bailee to explain his failure to redeliver, and where the bailee proves loss of the bailed property by theft but attempts no explanation of the circumstances and offers no proof of facts from which an inference of due care

may be drawn, he does not thereby rebut the presumption of negligence or want of due care arising from his failure to redeliver. The burden of proof remains upon the bailor to prove by a preponderance of all the evidence that the bailee was guilty of negligence or failure to exercise due care."

The additional cases now cited from many jurisdictions are in accord with the holding in the four cases just cited that when a bailor proves delivery of property to a bailee for hire and his failure to redeliver upon legal demand a prima facie case of negligence of the bailee is established; that the burden of going forward with evidence then shifts to the bailee to show that his failure to redeliver was not due to his fault or negligence; and that the burden of proof remains upon the bailor to prove by a preponderance of all the evidence that the bailee was guilty of negligence. *Hornor Transfer Company* v. *Abrams,* 150 Ark. 8, 233 S. W. 825; *Hight Accessory Place* v. *Lam,* 26 Ga. App. 163, 105 S. E. 872; *Burt* v. *Blackfoot Motor Supply Company,* 67 Idaho 548, 186 P. 2d 498; *Cluer* v. *Leahy,* 44 Idaho 320, 256 P. 760; *Lederer* v. *Railway Terminal and Warehouse Company,* 346 Ill. 140, 178 N. E. 394, 77 A. L. R. 1497; *Capitol Dairy Company* v. *All States Auto Body Builders, Inc.,* 339 Ill. App. 395, 90 N. E. 2d 278; *Brenton* v. *Sloan's United Storage and Van Company,* 315 Ill. App. 278, 42 N. E. 2d 945; *Lindor* v. *Burns,* 292 Ill. App. 201, 10 N. E. 2d 686; *Clemenson* v. *Whitney,* 238 Ill. App. 308; *Keenan Hotel Company* v. *Funk,* 93 Ind. App. 677, 177 N. E. 364; *Employers' Fire Insurance Company* v. *Consolidated Garage and Sales Company,* 85 Ind. App. 674, 155 N. E. 533; *Walter* v. *Sanders Motor Company,* 229 Iowa 398, 294 N. W. 621; *Strange* v. *Price Auto and Service Company,* 169 Kan. 98, 218 P. 2d 208; *McDonald* v. *Breaux Ballard, Inc.,* 298 Ky. 438, 183 S. W. 2d 26; *Threlkeld* v. *Breaux Ballard, Inc.,* 296 Ky. 344, 177 S. W. 2d 157, 151 A. L. R. 708; *Berkowitz* v. *Pierce,* 129 N. J. L. 299, 29 A. 2d 552; *Falls* v. *Goforth,* 216 N. C. 501, 5 S. E. 2d 554; *Hutchins* v. *Taylor-Buick Company,* 198 N. C. 777, 153 S. E. 397; *Potts* v. *Carter-Cobb Motor Company,* 191 N. C. 821, 131 S. E. 739;

*Trustees of Elon College* v. *Elon Banking and Trust Company,* 182 N. C. 298, 109 S. E. 6, 17 A. L. R. 1205; *Beck* v. *Wilkins-Ricks Company,* 179 N. C. 231, 102 S. E. 313, 9 A. L. R. 554; *Hanes* v. *Shapiro and Smith,* 168 N. C. 24, 84 S. E. 33; *Wheeler* v. *Packard Oklahoma Motor Company,* 169 Okl. 272, 38 P. 2d 943; *English* v. *Traders' Compress Company,* 167 Okl. 580, 31 P. 2d 588; *Arkwright Mills* v. *Clearwater Manufacturing Company,* 217 S. C. 530, 61 S. E. 2d 165; *Fleischman, Morris and Company* v. *Southern Railway,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A., N. S., 519; *Hislop* v. *Ordner,* 28 Tex. Civ. App. 540, 67 S. W. 337; *Afflerbaugh* v. *George Grede and Brother,* 182 Wis. 217, 196 N. W. 223; *Commercial Molasses Corporation* v. *New York Tank Barge Corporation,* 314 U. S. 104, 62 S. Ct. 156, 86 L. Ed. 89.

The correct rule, deduced from the foregoing authorities, is that in an action involving a bailment for hire proof by the bailor of delivery of the property to the bailee and of his failure to redeliver it upon legal demand establishes a prima facie case of negligence of the bailee and the burden of going forward with the evidence shifts to the bailee to show that his failure to redeliver was without his fault or negligence; but the burden of proof does not shift with the evidence but rests upon the bailor who must establish the negligence of the bailee by a preponderance of all the evidence. Under the law, as stated in the cited texts and cases, the circuit court erred in ruling that the plaintiffs were required to introduce proof that the destruction of their automobile was caused by the negligence of the defendant before the defendant introduced evidence to show that the fire which destroyed the automobile occurred without fault or negligence of the defendant.

The material facts relating to the manner in which the employee of the defendant operated the stoker shortly before and at the time the fire occurred and the nature and the point of origin of the fire are not disputed. The evidence introduced by the respective parties upon the issue of negligence upon the part of the employee of the defendant, in the operation of the stoker and in causing

the fire which destroyed the automobile of the plaintiffs, however, is conflicting. It can not be said, as matter of law, that the jury, from the evidence, could not reasonably draw the inference that the defendant was guilty of negligence which caused the destruction of the automobile of the plaintiffs. From the evidence the jury could find that the defendant, acting by its agent and employee in the operation of the stoker, was, or was not, guilty of negligence in causing the fire. This Court has repeatedly held that when the evidence is conflicting, or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them, the question of negligence is for the jury. *Davis* v. *Sargent,* 138 W. Va. 861, 78 S. E. 2d 217; *Wilson* v. *Edwards,* 138 W. Va. 613, 77 S. E. 2d 164; *Thrasher* v. *Amere Gas Utilities Company,* 138 W. Va. 166, 75 S. E. 2d 376; *Daugherty* v. *Baltimore and Ohio Railroad Company,* 135 W. Va. 688, 64 S. E. 2d 231; *Isgan* v. *Jenkins,* 134 W. Va. 400, 59 S. E. 2d 689; *Davis* v. *Pugh,* 133 W. Va. 569, 57 S. E. 2d 9; *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410; *Taylor* v. *City of Huntington,* 126 W. Va. 732, 30 S. E. 2d 14; *Nichols* v. *Raleigh-Wyoming Mining Company,* 116 W. Va. 163, 179 S. E. 70; *Chambers* v. *Princeton Power Company,* 93 W. Va. 598, 117 S. E. 480, 29 A. L. R. 1041; *Lindsey* v. *Bluefield Produce and Provision Company,* 91 W. Va. 118, 112 S. E. 310; *Walters* v. *Appalachian Power Company,* 75 W. Va. 676, 84 S. E. 617; *Jaggie* v. *Davis Colliery Company,* 75 W. Va. 370, 84 S. E. 941; *Ewing* v. *Lanark Fuel Company,* 65 W. Va. 726, 65 S. E. 200, 29 L. R. A., N. S., 487; *Foley* v. *City of Huntington,* 51 W. Va. 396, 41 S. E. 113; *Raines* v. *Chesapeake and Ohio Railway Company,* 39 W. Va. 50, 19 S. E. 565, 24 L. R. A. 226; *Hanley* v. *City of Huntington,* 37 W. Va. 578, 16 S. E. 807. In *Fielder* v. *Service Cab Company,* 122 W. Va. 522, 11 S. E. 2d 115, this Court held in point 1 of the syllabus that "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as

true which the jury may properly find under the evidence." *Hammersmith* v. *Bussey*, 136 W. Va. 437, 67 S. E. 2d 609; *Perry* v. *Scott*, 134 W. Va. 380, 59 S. E. 2d 652; *Raeder* v. *Sconish*, 133 W. Va. 795, 58 S. E. 2d 265; *Arrowood* v. *Norfolk and Western Railway Company*, 127 W. Va. 310, 32 S. E. 2d 634; *Webb* v. *Harrison*, 127 W. Va. 124, 31 S. E. 2d 686; *Boyce* v. *Black*, 123 W. Va. 234, 15 S. E. 2d 588; *Nichols* v. *Raleigh-Wyoming Coal Company*, 112 W. Va. 85, 163 S. E. 767. After submitting the case to the jury, the circuit court should have permitted the jury to determine whether, under the evidence, the defendant was guilty of negligence which caused the fire; and the action of the court, in withdrawing that question from the jury, in directing the jury to return a verdict for the defendant, and in entering judgment upon the verdict constituted reversible error.

The plaintiffs complain of the action of the court in giving Instructions Nos. 4, 5, 6, 7 and 8, and in refusing to give Instructions Nos. 9, 10, 11 and 12. Inasmuch as the court withdrew the case from the jury and directed a verdict for the defendant it is unnecessary to discuss those instructions in detail or to comment upon them except to say that the question whether they do or do not correctly propound the law is controlled by the principles enunciated in this opinion.

Under the authorities cited and for the reasons stated the judgment is reversed, the verdict of the jury is set aside, and a new trial is awarded the plaintiffs.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*